**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| GALE R. GOOD, | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civ. No. 05-1930 (WHW) |
| | : | |
| LINVATEC CORPORATION, et al., | : | |
| | : | |
| Defendants. | : | |

**Walls, Senior District Judge**

      Plaintiff Gale Good brings this suit against her former employer, Defendant Linvatec Corporation, to allege unlawful discrimination based on race and sex, in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et. seq, N.J.S.A. 10:5-12(a), and N.J.S.A. 10:5-12(1), and the principles of promissory estoppel. Plaintiff's claims arise from Defendant's failure to offer Plaintiff a distributorship or position with a distributor in April 2003, its failure to adhere to its alleged promises that Plaintiff would be permitted to sell the company's full product line, and Defendant's reduction of the southern New Jersey portion of Plaintiff's territory.

      Defendant now moves for summary judgment on all counts of the Complaint. Pursuant to Rule 78 of the Federal Rules of Civil Procedure, the Court decides this matter on the basis of

**NOT FOR PUBLICATION**

the written submissions of the parties.  Summary judgement is granted with respect to Count VI and denied on all other Counts.

**FACTUAL BACKGROUND**

Defendant Linvatec Corporation ("Linvatec") is a Florida-based company which develops and manufactures powered surgical tools, including Hall Surgical tools and medical imaging systems.  In 1998, Linvatec hired Plaintiff Gale Good ("Good") as a Territory Manager responsible for selling a single line of Linvatec products – the Hall Surgical line – in various regions of New Jersey.  Good, as well as other Linvatec sales representatives who exclusively sold this line of products, were known as "Hall-only" representatives.  Linvatec also maintained a substantial sales force trained in and responsible for the full line of Linvatec products.  Becoming a full-line representative required eighteen months to two years of training.  Good was not trained to sell products other than the Hall line, and she never made a request to become a full line representative before April, 2003.

Linvatec employed approximately 120 direct sales representative in 2003.  Forty-one of those employees were Halls-only representatives.  Good was the only African American sales person at Linvatec and one of five women.

In March 2003, Linvatec announced at a meeting in Tampa, Florida that the company would restructure its business by transitioning from a direct sales force to a network of independent manufacturer distributorships.  All employees were invited to the meeting.  Good was unable to attend because her daughter was having oral surgery.  The stated purpose of the restructuring was to make Linvatec more competitive in the marketplace and to grow the

**NOT FOR PUBLICATION**

company. Linvatec sought to increase the number of independent sales representatives working for the company. By going to a distributorship model, Linvatec could reduce overhead and get "more feet on the street." Good Dep. at 15.

At the meeting, Linvatec announced that it would offer an opportunity to set up distributorship franchises to a limited number of direct employees and that most other direct employees would be offered sales positions with the distributors. Of the more than 120 directly employed sales representatives, only eight were offered a distributorship. All eight of the individuals selected were white males. None of the five female direct sales representatives was chosen. All the individuals selected to set up a distributorship sold the full line of Linvatec products. Good testified that she was not aware of any Hall-only employees who were offered a distributorship. Id. at 65. Gary Stansi, a white male employee who, like Good, sold only the Hall line of products lobbied to be awarded a distributorship but was denied the opportunity.

Good initially learned about the restructuring from a colleague. She then had a conversation with Bill McGinty, her supervisor, about how the restructuring would affect her. Good testified that McGinty told her that New Jersey did not qualify for the distributorship model because the two territories in New Jersey combined, the territory of Good and the territory of her colleague Bill Jeans, did not total $12 million per year. Id. at 37-38.

After the restructuring, Good and Jeans were the only employees who remained direct salespersons. Jeans continued to sell the full line of products in New Jersey and to two New York hospitals. Good testified that Jeans was offered the option of working for a distributor or continuing as a direct employee of Linvatec, but opted to remain a direct employee because it

**NOT FOR PUBLICATION**

was better for him economically.  Id. at 84-85.  Good, in contrast, was not offered the opportunity to work at a distributorship.  She alleges that she was the only person employed by Linvatec who was not offered one of the new positions.  Id. at 189.

Shortly after the restructuring, McGinty conveyed to Good that Michael O'Grady, the Linvatec vice president of sales, was going to visit her to discuss bringing in a third representative to New Jersey and making Good a full line representative.  Id. at 67. McGinty did not personally promise Good anything.  Id.  Good and O'Grady met at the Newark Marriot Hotel in April, 2003.  Good asserts that at the meeting, O'Grady explained that everyone in the sales force was affected by the transition.  As a result of the restructuring, Good's territory was reduced by twenty percent.[1]  O'Grady asked Good if she thought there was enough business in New Jersey to bring in a third representative and Good agreed that there was.  O'Grady told Good that his intent was "to first and foremost make [her] a full line representative."  Id. at 14.  Good and O'Grady discussed the process of making Good a full line representative.  O'Grady explained that it would take eighteen months to two years for her to learn the full product line.  O'Grady also told Good that she would have to give up being a straight commission representative and go on salary.  According to Good, O'Grady told her that he recognized that it is "tough going back down the ladder."  Id. at 14.  Good understood O'Grady to be alluding to the "fact that [her] territory had been reduced and reduced territory reduced income."  Id. at 14.  However, O'Grady indicated that they were going to make some adjustments.  Id. at 69.  O'Grady suggested that Jeans and Good sit down and decide how to divide up the New Jersey

---

[1]Good's territory south of Raritan Bridge was assigned to a distributor.  Compl. at 6.

**NOT FOR PUBLICATION**

accounts. Id. at 72. He told Good that he would take the information back to the home office and get back to her regarding how they would proceed. According to Good, his words were, "Let me go back to the home office and work on this and I'll be in touch with you." Id. at 73.

At the meeting, Good expressed her interest in being trained to sell the full bag of products and told O'Grady that she viewed it as an opportunity to learn and ultimately earn more money. Id. at 68. Good did not indicate to O'Grady that she was considering other job opportunities or that becoming a full line representative was necessary for her continued employment at Linvatec.

Good testified that after the meeting with O'Grady, she made the decision to stay at Linvatec. She stated that she had previously considered leaving. However, she conceded that she did not have a specific job offer. Nor had she had not identified a specific job opportunity. Good did not consider changing residences before or after her meeting with O'Grady. Good testified that she initially felt fortunate to remain a direct sales employee at Linvatec. She was happy because 1) she was going to become a full line representative and 2) she would continue to receive health benefits and a 401K whereas if she went to a distributorship, she would have to pay for her own benefits. Id. at 82.

Good did not hear back from O'Grady and she was never trained in the full bag of products. Concerned about why her training had not begun, Good contacted Dawn Cavalier in human resources about being made a full representative. Id. at 95. In November, 2003, Good and O'Grady met again at the Newark Marriot Hotel. At the meeting, O'Grady told her that the process for making her a full line representative had not been initiated because in his view, it

**NOT FOR PUBLICATION**

would hurt her financially.  Id. at 98-99.

On December 31, 2004, Linvatec eliminated all remaining direct employee positions – Good's, Jeans', and two service associates'.  OR Specialties, a distributor, took charge of Good's and Jean's old territories.  OR Specialities offered Good a job selling both Linvatec and Hall products.  The company offered to provide Good with training in the Linvatec product line beginning in May.  In June, 2003, Good was fired.

**PROCEDURAL HISTORY**

On March 11, 2005, Plaintiff filed a Complaint in the Superior Court of New Jersey, Morris County.  The Complaint alleged six causes of action:

1) race discrimination in employment in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-2 to 12.6;

2) sex discrimination in employment in violation of the NJLAD, N.J.S.A 10:5-12 to 12.6;

3) race discrimination in contracting in violation of NJLAD, N.J.S.A 10:5-12 to 12.6;

4) sex discrimination in contracting in violation of NJLAD, N.J.S.A. 10:5-12 to 12.6;

5) breach of contract; and

6) promissory estoppel

Defendant removed the matter to the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1441 et seq.  Defendant then filed a Motion to Dismiss Counts III, IV, and V of Plaintiff's Complaint on April 27, 2005.  This Court granted Defendant's Motion to Dismiss with respect to Count V (for breach of contract) and denied it otherwise.  On September 6, 2005, Defendant filed an amended Answer.  Defendant now moves for summary judgement on

**NOT FOR PUBLICATION**

all remaining counts of Plaintiff's Complaint – Counts I-IV and VI.

**STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. See id. at 248. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. See Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To survive a motion for summary judgment, a non-movant must present more than a mere scintilla of evidence in his favor. Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001). The material fact or facts become genuine when a reasonable trier of fact could render a verdict for the non-moving party. Healey v. New York Life Ins. Co., 860 F.2d 1209, 1219 n.3 (3d Cir. 1988), cert. denied, 490 U.S. 1098 S.Ct. 2449 (1989).

**NOT FOR PUBLICATION**

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002).

**DISCUSSION**

    **1. Claims of Race and Gender Discrimination (Counts I-IV)**

The United States Supreme Court established a framework to analyze claims of discrimination in McDonnel Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). The New Jersey Supreme Court often looks to this framework and federal standards in interpreting the NJLAD. See, e.g., Clowes v. Terminix Int'l Inc., 109 N.J. 575, 595-97 (1988); Bergen Commercial Bank v. Sisler, 157 N.J. 188, 207 (1999); Andersen v. Exxon Co., 89 N.J. 483, 491 (1982).

Under the McDonald/Burdine framework, the plaintiff must first make out a prima facie case, which raises a rebuttalbe inference of discrimination. Burdine, 450 U.S. at 252-54. If the plaintiff succeeds in doing so, the burden shifts to the defendant to "articulate some legitimate, non-discriminatory reason for [plaintiff's] treatment." Id. at 253. The plaintiff must point to sufficient evidence in the record that the reasons proffered by the defendant were not truthful but rather "merely a fabricated justification for discriminatory conduct." Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 898 (3d Cir. 1987) (en banc), cert. dismissed, 483 U.S. 1052 (1987). A reason "cannot be proved to be a 'pretext for discrimination' unless it is shown both that the

**NOT FOR PUBLICATION**

reason was false, and that the discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (citations omitted).  At all times, the burden of persuasion remains on the plaintiff to prove her case by the preponderance of the evidence.  Burnadine, 450 U.S. at 253.

To establish a prima facie case of discrimination, the plaintiff must show that "it is more likely than not" that the employer's actions were based on unlawful considerations.  Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978).  The New Jersey Supreme Court has adopted the four-part test of McDonell Dogulas in which the plaintiff must show: "(1) that she is a member of a class protected by anti-discrimination law; (2) that she was qualified for the position or rank sought; (3) that she was denied promotion, reappointment, or tenure, and (4) that others with similar or lesser qualifications achieved the same rank or position."  Dixon v. Rutgers, 110 N.J. 432, 443 (1988).  However, the U.S. Supreme Court has made clear that the "standard is not inflexible as 'the facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required [from plaintiff] is not necessarily applicable in differing factual situations.'"  Burdine, 450 U.S. at 254, n.6 (quoting McDonell Douglas, 411 U.S. at 802 n.13)).

A plaintiff will survive summary judgment if he or she can produce sufficient evidence that the employer's proffered reasons for the allegedly discriminatory action are merely a fabricated justification for that action.  See Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 331 (3d Cir. 1995).  The plaintiff can do so by offering either direct or circumstantial evidence that (1) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action; or (2) casts sufficient doubt

**NOT FOR PUBLICATION**

upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a post hoc fabrication. Fuentes v. Perskie, 32 F.3d 759, 762-64 (3d Cir. 1994); Chipollini, 814 F.2d at 898.

Good alleges that she was discriminated against on the basis of her race and sex when Linvatec failed to offer her a distributorship or a position with a distributor and instead reduced her territory in direct sales. To survive summary judgment, Good must present sufficient evidence to (1) throw into question Linvatec's proffered reason for not offering Linvatec a distributorship or sales position with a distributorship or (2) to come forward with sufficient evidence from which a factfinder could reasonably conclude that race or gender more likely than not was a motivating or determinative cause of the adverse employment action.

### a. Refusal to Offer Good a Distributorship

The Court finds that Good has not established a prima facie case to support her claim of wrongful refusal to allow her to establish a distributorship because she has not satisfied the second prong of the prima facie case – that she "applied and was qualified for the position for which the employer was seeking applicants." Dixon 110 N.J. at 443.

First, it is undisputed that Good was a Hall-only employee and was not certified to sell the full line of Linvatec products.[2] Of the 120 employees at Linvatec, only eight were chosen to be distributors. Linvatec maintains that being a full line representative was a prerequisite to running a distributorship. At her deposition, Good conceded that she was not similarly situated

---

[2] It is worth noting that there were 41 Hall-only representatives. Good testified that prior to April, 2003, she had never expressed any interest in becoming a full line representative. She has made no allegations that the fact that she was not previously certified was discriminatory.

**NOT FOR PUBLICATION**

to others awarded distributorships.  Unlike every sales representative offered a distributorship, Good was never trained in and never sold any lines of products other than Hall Surgical.  Good Dep. at 2, 93-94.  She also stated that she did not know of any Hall-only sales representative who were offered or successfully petitioned for a distributorship.  In fact, in her deposition, she conceded that Stansi, a white male Hall-only representative who petitioned for a distributorship, was denied the opportunity.  Good knows of no other employee who petitioned for a distributorship.  Id. at 117.

Second, Good never applied for or asked to be considered for a distributorship.  Although courts have generally held that failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a prima facie case, the plaintiff must make some reasonable attempt to convey his interest in the job to the employer.  EEOC v. Metal Service. Co., 892 F.2d 341, 349 (1990).  After Good learned about the restructuring, she did not lobby for the opportunity to run a distributorship or even so much as express a passing interest to her supervisor.  In a letter to O'Grady, she describe herself as "fortunate" to "remain a direct employee."  Good Dep. at 81-82, 87.  Simply put, Good has put forth no evidence to enable a jury to reasonably conclude that Linvatec failed to offer her a distributorship on account of her race or gender.

### b.  Linvatec's Decision to Retain Good as a Direct Sales Employee

Good contends that Linvatec failed to offer her a position at a distributorship and instead reduced her territory in direct sales on account of her race and gender.  Good has put forth evidence that she was the only employee who was not afforded the opportunity to work at a distributorship.  Defendant has not contested the fact that Good was the single employee who

**NOT FOR PUBLICATION**

was not given the opportunity to work at a distributorship, nor has it advanced a sufficient justification for its decision. Rather, Linvatec's argument is premised on the fact that courts have generally accepted as legitimate a company's business decision to restructure its workforce. See, e.g., Edwards v. Schlumberger-Wells Servs., 984 F. Supp. 264, 278-79 (D.N.J. 1997); Sivestre v. Bell Atlantic Corp., 973 F. Supp. 475, 483 (D.N.J. 1997). Good does not question the legitimacy of Linvatec's decision to reorganize the workforce. What she challenges is Linvatec's decision to treat Good differently from other similarly situated employees by not offering her a new sales position with a distributorship.

In her deposition, Good testified that she was told that she would remain a direct employee because New Jersey did not qualify for a distributorship since her and Jeans' territory combined did not earn $12 million. However, this justification is questionable in light of the fact that Jeans, the other New Jersey direct sales representative, was offered the option of working for a distributorship. It is also suspect because, according to Good, other areas that earned under $12 million per year moved to the distributorship model. Good Dep. at 31.

Good was worse off based on her unique treatment. In contrast to Jeans who opted to remain a direct sales representative because it was financially beneficial to him, Good was simply directed to remain a sales representative. Meanwhile, the size of her territory was reduced. She was not trained in the full line of products to compensate her for the loss in territory, so she was financially worse off than before the re-organization. Linvatec has not come forth with a business justification to explain why Good was placed in this unique situation. Thus, there is an issue of material fact as to whether or not Good was treated differently on account of her race and

**NOT FOR PUBLICATION**

gender.  Accordingly, summary judgment is denied on Counts I-IV of the Complaint.

    **2.  Claim of Promissory Estoppel (Count VI)**

Linvatec claims that it is entitled to summary judgment on Good's promissory estoppel count because Good has failed to prove a prima facie case of promissory estoppel.  A prima facie case is established by showing: (1) there was a clear and definite promise; (2) the promise was made with the expectation that the promisee will rely on it, (3) the promisse must reasonably rely on the promise, and (4) the promisee must incur a detriment in reliance thereon.  Peck v. Imedia, Inc., 293 N.J. Super. 151, 165 (App. Div. 1996).  Linvatec argues that Good can show neither that she received a definite promise for the opportunity to sell Linvatec's full line of products nor that she relied on the alleged promise to her detriment.  In analyzing whether Good has made out a prima facie case of promissory estoppel for the purpose of surviving summary judgment, the Court is mindful that the non-movant's allegations must be taken as true and any inferences to be drawn from the facts in the record must be viewed in the light most favorable to the non-moving party.  Vastoler v. American Can Comp., 700 F.2d 916 (3d Cir. 1983).

A key element of promissory estoppel is that the promisee suffer some detriment in reliance on the promise.  Fregara v. Jet Aviation Business Jets, 764 F. Supp. 940, 949 (D.N.J. 1991).  Here, Good has offered no evidence of detrimental reliance.  She has not alleged that she changed her position or incurred an external cost as a result of O'Grady's representation that she would be trained as a full line representative.  Although she testified in her deposition that her decision to stay with Linvatec was based in part on her understanding that she would be able to sell the full bag of products in the future, she did not inform O'Grady or anyone else at Linvatec

**NOT FOR PUBLICATION**

that being a full line representative was a requirement for her to stay with company. She did not express to Livantec that she had any reservation about continuing with the company or that she was considering other job opportunities. See Moore v. Merril Lynch, Pierce, Fenner & Smith, Inc., No. 90-1182, 1991 WL 149881, at *7 (D.N.J. July 23, 1991) (holding that plaintiff's claim failed for lack of evidence of bargained for exchange and reliance where plaintiff never informed defendant that she was considering another job opportunity). Good was similarly unable to identify a specific job opportunity that she had forgone based O'Grady's representation.

 Instead, Good alleges that the failure to train her in the full line of products resulted in lower earnings and stymied her ability to perform at her subsequent employer, OR Specialties. However, there are several flaws with this argument as a basis for detrimental reliance. While it may have been advantageous for Good to be trained in the full line of products, the fact remains that she has put forth no evidence that she relied on the representation that she would be trained in pursuing a course of action. Also, becoming a full line representative required eighteen months to two years of training. Even if training had begun immediately after the meeting with O'Grady in April, 2003, Good would not have been fully trained when she began work at OR Specialties in January, 2004. Good has not produced any evidence that partial training would have allowed her to earn more money at Livantec or would have prevented her from being fired from OR Specialties. As the New Jersey Supreme Court made clear in Brill v. Gurdian Life Ins. Co. of America, summary judgement is warranted where plaintiff's argument is not supported by competent evidence. 142 N.J. 520, 540-41 (1995). Good has not demonstrated detrimental reliance. Accordingly, the Court finds as a matter of law that Good has not made out a prima

**NOT FOR PUBLICATION**

facie case of promissory estoppel.  Defendant is entitled to summary judgment on Count VI of the Complaint.

**CONCLUSION**

  For the foregoing reasons, the Court grants in part and denies in part Linvatec's motion for summary judgment.  An appropriate Order will follow.

                   **s/ William H. Walls, U.S.D.J.**

.